**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.   GJH 17 0667** |
| | * | |
| **DAVON CARTER,** | * | |
| Defendant. | * | |
| | * | |

_____

**GOVERNMENT'S CONSOLIDATED MOTIONS RESPONSE
TO DEFENDANT'S PRETRIAL MOTIONS**

The United States of America submits this consolidated response in opposition to the defendant's pretrial motions as follows: Motion to Suppress Cell Site Location Information (ECF 38), Motion for Separate Trial on Counts (ECF 40), and Motion to Suppress Tangible Evidence and Statement (ECF 41). For the reasons that follow, the motions should be denied.

**I.    POSTURE OF CASE**

On December 19, 2017, a federal grand jury in the District of Maryland returned an Indictment charging the defendant with Conspiracy to Murder a Witness (Retaliation), 18 U.S.C. §1513(f); Witness Retaliation Murder, 18 U.S.C. §1513(a)(1)(B); Conspiracy to Murder a Witness (Tampering), 18 U.S.C. §1512(k); Witness Tampering Murder, 18 U.S.C. § 1512(a)(1)(A); Felon in Possession of Ammunition, 18 U.S.C. §922(g); and Possession with Intent to Distribute Marijuana, 21 U.S.C. §841. The defendant was arrested on these charges on December 20, 2017, and he remains detained pending trial, presently set to commence May 6, 2019.

**II.    FACTUAL BACKGROUND**

**A.    Events leading up to Murder of Latrina Ashburne**

In June 2015, defendant Davon Carter's ("Carter") good friend[1] Matthew Hightower

---

[1] During Carter's recorded post-_Miranda_ statement on June 1, 2017, he conceded that he and

("Hightower") was charged with two other individuals[2] in a health care fraud scheme.   Hightower was released on electronic home monitoring.   Hightower had six previous drug related convictions, including a conviction in United States District Court in 2002 for possession with intent to distribute heroin, for which he was sentenced to 60 months in the Bureau of Prisons, followed by 4 years of supervised release.   *See United States v. Hightower,* CCB 02-163.

While Hightower was on release in the health care fraud case, the grand jury began investigating crimes of violence for which Hightower was implicated.   First, Hightower had been identified as the assailant, and arrested by Baltimore Police in a nonfatal shooting that took place in 2013.   The victim was Colvin Harrison.   Second, Hightower was the prime suspect in the 2013 murder of David Wutoh – a crime for which Hightower was ultimately charged in this Court, and convicted after a jury trial in September 2016.   Wutoh was murdered at approximately 2:45 a.m. on September 22, 2013, after being shot repeatedly through a window as he slept on the couch of a friend in Rosedale, Baltimore County, Maryland.   A key piece of evidence against Hightower included cell site information placing Hightower near the scene of the crime.

Several times while Hightower was on pretrial release in the health care fraud case, the government sought review of Hightower's release conditions – insisting he should be detained pretrial as a danger to the community.[3]

In or about July/August 2015, Hightower learned the identity of the health care fraud whistleblower (hereinafter "Witness"), who also had incriminating information against him

---

Hightower were "like family."

[2] Harry Crawford and Elma Myles.

[3] The government moved for Hightower's detention in September 30, 2015, December 2015, and again in February 2016.

relating to the Wutoh murder.   Hightower was deeply concerned that he would be incarcerated.[4]

Contrary to his release conditions, he began communicating with witnesses who had been in the

grand jury.   All the while, friends Hightower and Carter remained in frequent and regular contact.

On April 19, 2016, the grand jury returned a sealed superseding indictment against

Hightower charging both Crawford and Hightower with extortion and using interstate facilities for

extortion resulting in the death (murder) of David Wutoh.   See, *United States v. Crawford, Myles*

*& Hightower*, Criminal No. MJG 15-322 (ECF 143, 146).

On Friday, April 29, the government filed another Motion to Revoke Hightower's Release

conditions – this time based on the new extortion/murder charges and because Hightower had

engaged in prohibited contacts with grand jury witnesses during the investigation.   Counsel for

Hightower did not appear to receive the motion until Monday morning, May 2, at 9:03 a.m., when

he responded that he was not available until May 4 for a hearing.   Counsel formally responded

via email to the revocation motion on May 3 at 11:54 a.m. after meeting with Hightower at

approximately 11:00 a.m. in his office in downtown Baltimore.   Hightower and Carter exchanged

text messages that night and were in telephone contact again early on the morning of May 4.   The

hearing was held at approximately 11:00 a.m. on May 4, 2016.   Hightower was detained, and has

been in jail since that time.

On May 7, 2016, at 11:45 a.m., Hightower called his girlfriend ("Girlfriend 1") and asked

her to get him Davon's phone number.   He also wanted Carter to send him some money and for

her to get some materials to write letters on.   On May 7, at 6:12 p.m., Hightower called Girlfriend

---

4 For example, in a text message to his girlfriend on November 30, 2015, Hightower wrote: "The
court hearing is heavy on my mind." She asked if he was "worried about the outcome" to which
he responded, "yes I'm worried about the outcome" and "Most of all I'm scared to leave you."

1 again and she advised him to be cautious about his words: "you know the prosecutor [] is listening to the whole thing."

While Hightower was detained, Carter assumed responsibility for Hightower's marijuana distribution business, and engaged in direct communications with the source of supply. Carter also collected money and ran other errands for Hightower.

On May 16, 2016, Carter was pulled over and cited for failing to securely fasten a registration plate to the vehicle and to display his license to the police on demand. Carter was driving a 2008 Audi owned by Hightower but registered to the brother of Hightower's live-in girlfriend ("Girlfriend 2") who was the mother of his children.

On May 25, 2016, Carter began using a pre-paid flip phone (443-386-7626). The morning he activated the phone, he saved contact information for another close friend of Hightower referred to in his flip phone and hereinafter as "C". Carter and "C" were in contact the evening of May 26 and first thing in the morning on May 27. The government will establish through evidence that includes cell site location information (CSLI) for Carter's 7626 number and "C's" phones, apartment security surveillance video, and witness testimony, that Davon and "C" met approximately a block away from Witness's home at or about 6:15 a.m. on May 27, 2016.

**B. The Murder of Latrina Ashburne**

At approximately 7:15 a.m. on May 27, Ms. Ashburne exited the home she shared with her mother to go to work at a nearby school where she was a teacher's assistant. As she approached her car, a hooded man walked up and shot her at close range. She was not robbed. A neighbor who witnessed the shooting called 911. While police and emergency personnel arrived to the scene, Ms. Ashburne's next door neighbor, Witness, texted Department of Health & Human Services Special Agent Erin Fuchs ("SA Fuchs") asking her to contact her "ASAP" which SA

Fuchs did.  The text was sent at 7:35 a.m.  Witness told SA Fuchs she believed she was the intended target.

### C.  The Investigation Leads Immediately to Carter

As SA Fuchs contacted Baltimore homicide detectives to report the lead from Witness, BPD was collecting surveillance video from a neighboring apartment complex.  The cameras captured the killer moments after the shooting as he briskly walked/ran to a parking lot, as if he was anticipating that a car would be there to drive him away.   However, there was no car, so the shooter continued his flight from the shooting.  Approximately eight seconds later, a Pontiac entered the same parking lot.  The Pontiac stopped in a position to see directly up the path where the shooter had passed by moments before.  The Pontiac backed up, paused for a moment, and then slowly drove away and, in the process of doing so, a security camera obtained a clear photograph of the license tag.   As police and emergency crew started to arrive, the Pontiac came into view again, circling the area, apparently looking for something or someone.

Armed with the information from Witness, and the videos, investigators traced the Pontiac to the mother of Carter's pregnant girlfriend (DL).

### D.  Stop and Questioning of Carter by BPD

On June 1, 2016, detectives arrived at Carter and DL's apartment and began surveillance. The Pontiac was parked in a nearby space.    Carter exited the building and went to the Pontiac. Carter's height and weight were consistent with the shooter as described by witnesses and depicted in the video.   Carter then entered a nearby black BMW truck and got in the driver's seat.   The BMW truck was registered to Hightower.

The detectives stopped the BMW and the smell of marijuana emanated from the vehicle.

Police located two pounds of marijuana and over $7,000 in cash in a duffle bag.[5]  Investigators subsequently towed the car and obtained a federal warrant to search the BMW, another car belonging to Carter and his apartment.   A copy of the federal affidavit is attached hereto as Exhibit A.

Baltimore County police arrived on the scene. Carter was administered *Miranda* warnings by a Baltimore County police officer and made statements to her that the government will seek to introduce at trial.   Carter falsely stated that the vehicle belonged to his friend "Tony" (in truth, the car belonged to Hightower) and stated he "had no idea about the drugs and that [the police] could take it."   Carter said he was driving the vehicle because his girlfriend's car currently had bad tags.

Carter was transported to BPD homicide to be interviewed.   The interview was audio and video recorded.   Carter was advised of his *Miranda* warnings a second time and told of the nature of the investigation.   He provided a provably false alibi and made several other statements the government will seek to introduce at trial.   He admitted to being in possession of the Pontiac the morning of May 27.   He contended he dropped the Pontiac off to get new front brakes from a guy named "Tony" "who gets high" and can be found "up there off of Park Heights…always wandering around."

## III.    PENDING MOTIONS

### A.  Motion to Suppress Cell Site Location Information (CSLI) (ECF 38)

The defendant has moved to suppress CSLI obtained for his cellular telephones pursuant to statutory authority found in the Stored Communications Act, 18 U.S.C. § 2703(d) (SCA).

---

5 The duffle bag contained marijuana, a white shopping bag containing $7,322 in cash, a digital scale, food sealer, a bag containing sandwich baggies and heat-sealed bags, and phone accessories.

His entire argument is premised on the Supreme Court's recent holding in *Carpenter v. United States*, 585 U.S. __, 138 S.Ct. 2206 (2018) that the government's acquisition of cell site records is "a search within the meaning of the Fourth Amendment" and requires a search warrant. *Id.* at 2220. While *Carpenter* is obviously controlling going forward, it has no effect on the defendant's case.

Here, the government acted under then-prevailing authority that Section 2703(d) orders were the appropriate vehicle for obtaining CSLI. When investigators "act with an objectively 'reasonable good-faith belief' that their conduct is lawful," the exclusionary rule will not apply. *Davis v. United States*, 564 U.S. 229, 238 (2011) (*quoting United States v. Leon*, 468 U.S. 897, 909 (1984)).

The Fourth Circuit recently addressed the applicability of the good faith exception post-*Carpenter* in a case procedurally similar to this one. In *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir.), *cert. denied,* 139 S. Ct. 278 (2018), the Court stated that, "[w]ithout question….the good-faith exception to the exclusionary rule applies to investigators' actions" that reasonably relied on court orders and the SCA in obtaining CSLI records. Accordingly, suppression of CSLI obtained lawfully prior to the Supreme Court's decision in *Carpenter* is improper. The relief requested is not available, so the motion must be denied.

**B. Motion for Separate Trial on Counts (ECF 40),**

The defendant asks the Court to sever Count Six charging possession with intent to distribute marijuana from the "remaining witness related offenses" (murder) asserting "there is no connection between [the two crimes]." Carter states that the "narcotics offense has absolutely nothing to do with the murder of a potential witness. The witness was to testify in a fraud trial and narcotics had nothing to do with that case." He is wrong

The government's theory at trial will be that Carter is a very close associate of

Hightower's (they were "like family") who handled his "affairs" while Hightower was incarcerated for the Wutoh extortion murder and health care fraud scheme.   The evidence will show that Carter helped Hightower in a number of ways, to include handling his marijuana source of supply, collecting debts from marijuana customers, managing Hightower's cars, running errands, financial assistance -- and murder.    Further, at the time of Ms. Ashburne's murder, the witness was not just set to testify in a "fraud case", but a murder extortion case where the government introduced evidence that the victim (Wutoh) and Hightower discussed repaying the loan Wutoh owed to Hightower with illegal pharmaceuticals.

The offenses are also related temporally and help explain the criminal relationship between the two men.   The marijuana was found in a BMW driven by Carter moments after Carter entered the car he drove to the homicide, which provides a critical link.   Carter lied to the uniformed officer that the BMW belonged to "Tony" when in fact it belonged to Hightower. When interviewed by homicide detectives that same day, Carter provided them an explanation for his whereabouts the morning of May 27: he dropped the Pontiac off to someone named "Tony" to put new brakes in and then went to Myrtle Beach.

To prevail on his severance motion, Carter must demonstrate either that joinder is improper under Federal Rule of Criminal Procedure 8(a) or that the court should sever the counts under Rule 14(a), despite the propriety of joinder. The Government will address both in turn.

1.    Joinder

Fed.R.Crim.P 8(a) provides that the indictment may charge a defendant in separate counts with two or more offenses if [1] the offenses charged are of the same or similar character, [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan."   "[J]oinder is the 'rule rather than the exception."   *United States v. Hawkins,* 776 F.3d 200, 206 (4th Cir. 2009) (citation omitted).

In *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir.2005), the Court recognized that "Rule 8(a) 'permit[s] very broad joinder' " because it creates "efficiency in trying the defendant on related counts in the same trial."   *See also United States v. Mir*, 525 F.3d 351, 356–57 (4th Cir. 2008).   This is particularly so where evidence of one charge would be admissible in a case involving the other.   *See United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008); *United States v. Jamar*, 561 F.2d 1103, 1106–07 (4th Cir. 1977) (noting that "if the evidence of all the joined crimes would be mutually admissible for legitimate purposes in separate trials for each offense (assuming no joinder), the possibilities of prejudice from the fact of joinder no longer present themselves so forcefully").

Here the government contends the offenses are "connected with or constitute parts of a common scheme or plan."   The Fourth Circuit interprets this prong of Rule 8(a) "flexibly, requiring that the joined offenses have a 'logical relationship' to one another."   *Cardwell*, 433 F.3d at 385 (*citing United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir.1992)).   "Such a relationship exists when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." *Id.* (internal citations omitted). Though a "mere temporal relationship" alone is not sufficient to show that two crimes are logically related but that fact, combined with additional evidence, may provide the required link if "a factfinder [can] infer" the "logical connection between the two counts."   *Cardwell*, 433 F.3d at 387.   The Fourth Circuit has explained that, "[i]n determining whether two offenses are connected with or constitute parts of a common scheme or plan for purposes of Rule 8(a), we have read the rule 'flexibly' to require simply a 'logical relationship' between offenses charged in the indictment." *United States v. Blair*, 661 F.3d 755, 769 (4th Cir. 2011)(citation omitted). A logical relationship exists "when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." *Cardwell*, 433 F.3d at 385.

Trying these charges separately would lead to significant inconvenience for the government and its witnesses, and required a needless duplication of judicial effort in light of the legal, factual, and logistical relationship between the charges. *Mir,* 525 F.3d at 356. Carter's false explanations on June 1, his use and possession of various cars belonging to Hightower (the silver Audi used to go to Myrtle Beach and the black BMW), and his criminal relationship with Hightower, are all necessary to establish a motive for committing a murder for Hightower.

The government must prove that Carter would commit murder for Hightower. It is critical to establish all aspects of their relationship – particularly at a time when Hightower was in jail pending trial for another murder.[6] Joinder would avoid two trials with "much of the same proof when one would suffice." *Jamar*, 561 F.2d at 1107. What is more, based on the logical and factual connection between the marijuana and the murder, and the "very broad joinder" requirements of Rule 8(a), joinder in this case is plainly proper.

2.    Severance

Rule 14 of the Federal Rules of Criminal Procedure ("Relief from Prejudicial Joinder") provides in pertinent part: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Under Rule 14, the court has discretion to require a severance if the defendant establishes that actual prejudice would result from a single trial. *Blair*, 661 F.3d at 770 (emphasis supplied). In other words, a severance under Rule 14 is proper "only if there is a serious risk that a joint trial would ... prevent the jury from making a reliable judgment about

---

6 To this end, Carter was well aware of Hightower's extortion scheme that led to Wutoh's murder by Hightower in 2013. Jail calls between the two were introduced against Hightower in the September 2016 trial and pertinent calls regarding the intended victim will be introduced against Carter in his murder trial in May.

guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539 (1993). A defendant who moves for severance under Rule 14 has the burden of demonstrating "a strong showing of prejudice." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984). "It is a "daunting task" to demonstrate such a serious risk. *Blair*, 661 F.3d at 770. Severance is not appropriate merely because it might improve the defendant's chances for an acquittal. *Id.* Rather, "[t]here must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other...." *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002). Finally, the trial judge must balance the interest in judicial economy against the risk of prejudice to the defendant. *Zafiro,* 506 U.S. at 539.

In *Goldman,* 750 F.2d at 1224, the Fourth Circuit identified "three sources of prejudice" that may justify the granting of a severance under Rule 14. First, the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict him of either if they could keep the evidence properly segregated. The crimes here are separate and distinct and the court would properly instruct about the proof required to convict the defendant beyond a reasonable doubt of each. Confusion is not an issue in this case as opposed to a case, for example, with multiple bank robberies.

The second source of prejudice is that the defendant may be "confounded" in presenting defenses. *Goldman*, 750 F.2d at 1225. As the court explained:

> In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying.

*Id*. (citation omitted). When coupled with his criminal history and the evidence of numerous

false statements he has made to witnesses and police in this case, the scenario is highly unlikely; nor has he alleged such.    Indeed, Carter confessed to the marijuana in the same recorded statement the government will introduce to prove Carter made a number of false exculpatory statements as to the homicide.

The third source of prejudice is that the jury may conclude that the defendant is guilty of one crime and then find him guilty of the other because of his criminal disposition.    *Id. citing United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976)).    In analyzing the prejudice component, the court must consider whether, if there were a severance, evidence under one of the severed counts would in all probability be admissible at a trial on the other count.    Again, Carter fails woefully in his boilerplate motion.    He has not shown that the evidence as to drug trafficking would be inadmissible at a separate trial as to the witness murder counts.    Nor could he.    His criminal relationship with Hightower is clearly intertwined with all charges.

While there may be some degree of bias in a joint trial, the Fourth Circuit has held that limiting instructions coupled with reliance on the jury's ability to follow such instructions and compartmentalize proof regarding multiple charges adequately addresses that concern. *Cardwell*, 433 F.3d at 388.    Since juries are presumed to follow their instructions, see *Zafiro*, 506 U.S. at 540, and the charges are rather straight forward, such instructions will effectively deal with potential prejudice inferred between the six counts.    A limiting instruction regarding to the jury requiring them to consider each count separately should suffice.    The charges are properly joined and the motion to sever should be denied.

Nor has Carter indicated how his defenses would be adversely affected by way of a joint trial.    A conclusory assertion of unfairness fails to satisfy his burden of demonstrating a strong showing of prejudice.    Any potential for prejudice can be addressed by a cautionary instruction. See, e.g., *Blair*, 661 F.3d at 770 (finding no prejudice where court issued a limiting

instruction).   He has cited no authority for the proposition that a jury would be unduly prejudiced such as to convict a man of murder who also possessed with intent to distribute two pounds of marijuana.   That is plainly illogical and the jury would be instructed otherwise.

In conclusion, a joint trial of Counts One and Three is warranted by the specific facts of this case and it is well within the court's absolute discretion to try these charges in one trial.

### C.  Motion to Suppress Tangible Evidence and Statement (ECF 40

Carter has moved to suppress the following evidence obtained on June 1, 2016, five days after the Ashburne murder.

- Black duffel bag containing drug, drug paraphernalia, and cash.
- Carter's three cell phones and DL's cell phone.[7]
- Evidence seized during the search of 8409 Arbor Station Way, Apt K Parkville, MD 21234.

He also claims that post-*Miranda* statements made to police on June 1, 2016 were involuntary and obtained as a result of the unlawful search and seizures that preceded them.   For the reasons set forth below, the suppression motions should be denied.

### a.  Stop and Search of the Black BMW

Carter first claims that law enforcement stopped him in the BMW on June 1, 2016 without reasonable suspicion to believe "criminal activity was afoot" and in violation of the Fourth Amendment.    Def. Mtn. Suppress at 3 citing *United States v. Wilson*, 205 F.3d 720, 723 (4th Cir. 2000)(a stop "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, or unlawful conduct.").   This claim is easily rejected.   A woman was murdered four days previous and Carter, who fit the description of the shooter, was seen entering the very car captured in video at the scene of the murder in an apparent missed effort to

---

[7] Carter has no standing to challenge the search of DL's phone insofar as it was obtained by her at the time of her interview.

pick up the shooter.    The police had every right to conduct an investigatory stop of Carter and to

search the BMW.    An investigatory stop is permissible under the Fourth Amendment if

supported by reasonable suspicion, *Terry v. Ohio*, 392 U.S. 1 (1968), and a warrantless search of

a car is valid if based on probable cause, *California v. Acevedo*, 500 U.S. 565, 569–570 (1991).

Police officers can also make warrantless arrests as long as they act on basis of probable cause.

*United States v. Williams*, 10 F.3d 1070, 1074 (4th Cir. 1993)("The evidence needed to establish

probable cause is more than a mere suspicion, rumor, or strong reason to suspect but less than

evidence sufficient to convict."

    "Reasonable suspicion" and "probable cause" are commonsense, nontechnical

conceptions that deal with "'the factual and practical considerations of everyday life on which

reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 231,

(1983) (*quoting Brinegar v. United States*, 338 U.S. 160, 175.    The Supreme Court has

described reasonable suspicion simply as "a particularized and objective basis" for suspecting the

person stopped of criminal activity, *United States v. Cortez*, 449 U.S. 411, 417–418 (1981), and

probable cause to search as existing where the known facts and circumstances are sufficient to

warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be

found, *see Brinegar*, *supra*, at 175–176.    The principal components of a determination of

reasonable suspicion or probable cause will be the **"events which occurred leading up to the**

**stop or search**, and then the decision whether these historical facts, viewed from the standpoint

of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause."

*Ornelas v. United States*, 517 U.S. 690, 696 (1996); *United States v. Slocumb*, 804 F.3d 677,

681–82 (4th Cir.2015) (internal citations omitted).

    The proper investigatory purpose in this case is readily apparent by the facts and

circumstances of a fast moving homicide investigation.    Time was obviously of the essence as

police searched not only for the shooter but for tangible evidence (such as the gun) as well. Carter fit the description of the fleeing subject and then, through investigation and surveillance, was connected to the associated getaway vehicle (the Pontiac), observed entering that vehicle and then entering a second car, possibly taking key evidence with him.   The automobile exception to the Fourth Amendment is based on the inherent mobility of the automobile. *United States v. Kelly*, 592 F.3d 586 (4th Cir. 2010) (the exception applies as long as a car is readily mobile and capable of being used).

In *United States v. Hensley*, 469 U.S. 221 (1985), the Supreme Court found the police were justified in making an investigatory stop of the defendant to investigate a completed crime and in reliance on another police department's "wanted flyer" seeking information about an armed robbery because the defendant matched the description contained in the flyer. *Id.* at 229 ("if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.")   Here, the investigating detective who stopped Carter actually saw the video of the shooter and the Pontiac at the scene of the murder. *See also United States v. Marxen*, 410 F.3d 326, 331-32 (6th Cir. 2005) (Police had reasonable suspicion to stop a car that an eye witness to an armed robbery reported as the getaway car; *United States v. Tilmon*, 19 F.3d 1221, 1228–29 (7th Cir. 1994) (Police had reasonable suspicion that car and its driver were involved in bank robbery, for purposes of determining reasonableness of investigatory stop in view of exact match on unique automobile and driver's fitting general description of bank robber); *United States v. Jackson*, 652 F.2d 244, 248–49 (2d Cir. 1981) (reasonable suspicion to stop suspected bank robber where age, race, hairstyle and coat color matched description of robber, despite the fact that he was not wearing the exact clothing described by eyewitnesses).

At the time of the stop challenged here, the police saw Carter with the getaway car and he matched the physical description/appearance of the shooter.   These two facts alone provide objectively reasonable suspicion.   Moreover, as will be detailed below, the police knew much more at that time.   Hence, the stop undoubtedly complied with the Fourth Amendment.

Having made the lawful stop, the police smelled marijuana.   Again, this fact alone justified the next step of the investigation: searching the BMW.   The Fourth Circuit has "repeatedly held":

> …that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place. In *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir.2002), for example, we held that the smell of marijuana emanating from a properly stopped automobile constituted probable cause to believe that marijuana was in the vehicle, justifying its search. Similarly, in *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir.2001), we recognized that the strong smell of marijuana emanating from an open apartment door "almost certainly" provided the officer with probable cause to believe that marijuana was present in the apartment. *See also United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir.1974) (holding that officers' sight of boxes inside a van coupled with the strong odor of marijuana permitted seizure of the boxes because they were in "plain view, that is, obvious to the senses"). While smelling marijuana does not assure that marijuana is still present, the odor certainly provides probable cause to believe that it is. Thus, when marijuana is believed to be present in an automobile based on the odor emanating therefrom, we have found probable cause to search the automobile, and when the odor of marijuana emanates from an apartment, we have found that there is "almost certainly" probable cause to search the apartment.

*United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004).   The automobile exception to the warrant requirement is met because the odor emanated from a confined location (the BMW) and it was reasonable to conclude that there was marijuana in the car. *Id. citing United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002) and *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir. 2001).

In addition, though certainly unknown to Carter at that moment, the police had ample probable cause even without the marijuana smell to make the investigatory stop AND to search the car.   On June 1, as detailed in the subsequent affidavit in support of a search for the BMW,

*see* Exhibit A, investigators had already identified Carter and connected him to Hightower, and, therefore, a motive for the murder of Witness.

Therefore, the warrantless search of the car was not in violation of the Fourth Amendment.

Even if the Court should find the search by BPD unconstitutional, the evidence should still not be suppressed.   "Independent" or "inevitable" discovery refers to discovery of evidence that occurred or would have occurred (1) despite the unlawful behavior and (2) independently of that unlawful behavior. *See Nix v. Williams,* 467 U.S. 431, 443-444 (1984).   These are well established exceptions to the warrant requirement. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

To find the search with a warrant genuinely independent, for purposes of the independent source exception to the exclusionary rule, the unlawful search must not have affected: (1) the officer's decision to seek the warrant, or (2) the magistrate judge's decision to issue it.   *United States v. Hill*, 776 F.3d 243 (4th Cir. 2015).   Having connected Carter and the Pontiac to the murder, federal authorities obtained a warrant to search Carter's car, the BMW, and the apartment he shared with DL.   The warrant, attached hereto as Exhibit A, was authorized Magistrate Judge Beth P. Gesner on June 1, 2016, and clearly establishes independent probable cause for the searches.   Most important for purposes of the analysis here, the warrant is not based on any evidence seen, smelled or seized during the challenged unconstitutional search.   In other words, the federal warrant for the car was not based on the smell of marijuana or the subsequent seizure of it but rather on the status of the investigation at that time.   Federal agents obtained a warrant to search the BMW **because of the ongoing investigation** of the murder and Carter's involvement in it and not because two pounds of marijuana was found in the BMW.

Discovery of the drugs and cash was also inevitable.   The inevitable-discovery doctrine

17

allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have "ultimately or inevitably" discovered the evidence by "lawful means." *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017); *citing* Nix, 467 U.S. at 444, 104 S.Ct. 2501. "Lawful means" include an inevitable search falling within an exception to the warrant requirement, such as an inventory search in *Bullette*, that would have inevitably uncovered the evidence in question. *Bullette,* 854 F.3d at 265; *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998). Here, federal law enforcement undoubtedly intended to get a warrant to search locations associated with Carter (such as his apartment and cars) once he was identified because that is exactly what they did.

Last, Carter claims the search of his person and the BMW was completed after an unlawful extension of a traffic stop citing *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). Def.Mtn.Suppress at 5 ("The stop was prolonged unjustifiably beyond the time needed to execute the relevant tasks, violating his Fourth Amendment right.") *Rodriguez* held that, absent reasonable, articulable suspicion of criminal activity, a detaining officer may not extend an otherwise-completed traffic stop in order to conduct a dog sniff. *See id*. at 1614–16. The Court emphasized that, under *Terry*, the "[a]uthority for the seizure ... ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 1614. In other words, to extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess "reasonable suspicion or receive the driver's consent."

The defendant's argument premised on *Rodriguez* fails for a number of reasons. First, Carter was not stopped for a traffic infraction, he was stopped because he was connected to a homicide. Second, the smell of marijuana was immediately apparent, so the search of the car was justified. Third, once the drugs, cash and other paraphernalia items were recovered, the

defendant could have been arrested for that offense.   There is no indication that the time from

when the defendant was first stopped to the time when the vehicle he was operating was searched

was unlawfully extended; quite the contrary, it will be established at the hearing that the officers

acted with diligence and pursued matters expeditiously. There was no "unlawful extension" of

the stop.

### b.  Cellular Telephones

The defendant claims that "the cell phones recovered were fruits of the illegal stop and

unreasonable search and seizure and thus were obtained in violation of the Fourth Amendment

and should be suppressed." Def.Mtn.Suppress at 5.   For the same reasons detailed above,

Carter's cellular telephones were properly seized from on June 1.   Police subsequently obtained

warrants to search the phones.   The court should deny this part of his motion as well.

### c.  Arbor Station ("the apartment")

As stated above, federal agents obtained a warrant on June 1 from Judge Gesner to search

the defendant's residence on Arbor Station Way ("the apartment"), the BMW and a Toyota in the

same parking lot as the BMW and Pontiac. Carter complains the warrant did not have "sufficient

facts … [as to] whether this particular residence may contain evidence of the alleged crime" and

that there was no nexus between the alleged crime and the apartment. Def. Mtn to Suppress at 6.

He also makes vague particularity challenges.   His legal challenges are without merit.

Paragraphs 5 through 12 of the warrant set forth a detailed chronology as to a possible

motive for the Ashburne murder by Hightower. Paragraph 13 related how Ashburne's neighbor

(referred to as "Source of Information" or SOI in the warrant) reported the murder to federal

investigators because SOI believed SOI was the intended victim. Paragraph 14 reported that a

Pontiac believed to directly involved with the shooting was linked to the Arbor Station

apartment.   Carter's resemblance to the murder suspect captured on video running from the

19

shooting and the fact that Carter exited the apartment building and entered the Pontiac believed to have been the planned getaway car for the murder was detailed in Paragraph 15.   Paragraph 16 states that Carter exited the Pontiac and entered a black BMW registered to Hightower. Paragraph 17 further established Carter's residence at the apartment and the fact that a third car, registered to Carter, was also parked at the apartment complex.

Paragraph 18 associated a phone number for Carter, but subscribed in the name of his girlfriend, with the apartment.   The same phone number had been in regular contact with Hightower at the Chesapeake Detention Facility (CDF) since May 12, 2016.   Paragraph 19 further linked the phone number to Carter via a handwritten note recovered from Hightower's jail cell the day of the murder.   The affiant provided prior criminal arrests and conviction information for Carter and Hightower (including drugs, guns and violence) in Paragraphs 20 and 21.   Paragraph 22 reported that Hightower was contacting his own cellular telephone number while in jail – an indication that another person was using his phone.   Finally, Paragraph 23 added the affiant's opinion that persons who commit the crimes being investigated in this case often have evidence of those crimes in their homes and cars.

Based on this information, the warrant sought authority to search for evidence listed in Attachment B (below) "including but not limited to [evidence regarding] the relationship between Davon Carter and Matthew Hightower."   Exhibit A at 2.   A review of the listed items reflects the particularity of the items to be searched for – carefully crafted and limited in scope. The items sought are clearly ones that would be found in a person's home or residence.

Attachment B

1.    Any records that refer or relate in any way to Davon Carter's use and possession of the black BMW, Pontiac and/or Toyota Corolla discussed in the affidavit including but not limited to gas receipts, keys, title records, insurance information, repairs.

2.    Any records that refer or relate in any way to Davon Carters whereabouts on May 27 – June 1, 2016 and contacts during this same time timeframe.

3.    Indication of occupancy, residency, and/or ownership of the SUBJECT PREMISES, including but not limited to, utility and telephone bills, canceled envelopes and key;

4.    Cellular telephones, including any and all electronic data contained within, any and all electronic devices capable of sending, receiving, or storing electronic communications and or, sending, receiving, or storing electronic data, including any and all electronic communications and data contained within.

5.    Any records that refer or relate to Matthew Hightower or his pending federal case.

6.    Any records that refer or relate in any way to intended murder victim.

7.    Any records that refer or relate to phone numbers utilized by Matthew Hightower and Davon Carter including but not limited to  443-293-2399 and 443-983-2513.

8.    In addition to the above, for any cellular phone (hereinafter, "cell phone"):

The items sought in Attachment B are clearly and carefully connected to the crimes being investigated, and the warrant clearly established probable cause.   This Court should not second guess the decision making of the Judge Gesner to authorize the warrant in an active homicide investigation.   And even if the Court found the warrant lacking in some aspect, the agents clearly relied in good faith such that at any evidence seized should not be excluded.   *Leon*, 468 U.S. 897 (1984)).

**d.  Statements**

Carter first claims that his statements were the fruits of an unlawful seizure of his person and the BMW on June 1.   For the reasons set forth above, this is nonsense.   The police acted lawfully and with reasonable suspicion when they pulled Carter over in the BMW to question him.   He was subject to arrest for possession with intent to distribute marijuana.   There was even probable cause to arrest him for involvement in the homicide.   He resembled the fleeing shooter, had access to the very car used to commit the crime <u>and</u> was driving a BMW owned by the person believed to have the motive for the murder.   The facts known to investigators at the

21

time supported a probable cause arrest for murder in addition to narcotics trafficking.   His first statement regarding the drugs was on the scene of the traffic stop after discovery of the marijuana.   He was properly administered his *Miranda* warnings.

Later, he was transported for questioning and agreed to answer questions videotaped by homicide detectives.   Nevertheless, Carter claims there was an unreasonable delay between the vehicle stop and that recorded interview.   He notes the traffic stop was at approximately 10:27 a.m. and the interview began at 4:27 p.m. Carter was transported to police offices for formal interrogation.   He was *Mirandized* for the second time and again on tape by homicide detectives. Carter did not confess – he continued to lie until the time he asked for counsel.   He is at ease during the interview and was clearly neither intimidated nor coerced into making an unlawful statement.

Moreover, Carter was not under arrest.   While he was *Mirandized,* a partial colloquy of his interview follows:

### 6/1/2016 Transcript of Inception of Interview of Davon Carter at Baltimore City Police Department.

16:27 SGT. SEAN JONES and DAVON CARTER walk in the room.   DAVON CARTER asks to use the bathroom.

16:27:35 DAVON CARTER walks out.

16:28:53 DAVON CARTER walks back in with detectives; SGT. SEAN JONES closes the door.   Interview starts.

SGT. SEAN JONES:   Hear me out all the way through this, OK? And we will talk about it.   **You are not currently charged with any crimes**.   But in order to talk to you about why you're here today, um, what we think happened on Friday morning? We're going to go through this.   But you're going to have some control over the situation, alright?   It's like TV, man. You have the right to remain silent.   You know that, right?

DAVON CARTER:   [nods head]

SGT. SEAN JONES:   Anything you say or write can be used against you in the court of law.   You know that, right?

DAVON CARTER:   [nods head, moves in his chair]

SGT. SEAN JONES:   You have the right to talk to an attorney before any questions or during any questions.   Number four is important. This is important. Listen good.   If you agree to answer questions, YOU can stop at any time and request an attorney and we are not going to ask you any more questions.   Cool?

DAVON CARTER:    [nods head]

SGT. SEAN JONES:  Number five.   If you want an attorney and can't afford to hire one, ah, an attorney will be appointed to represent you and that's going to be a public defender.   You understand all that?

DAVON CARTER:    [nodding head] yes.

SGT. SEAN JONES: [slides paper over to DAVON CARTER and gives him a pen to sign].   I need your initials after each one of those lines.   If you don't understand something, please let me know and I'll fully explain it to you.

DAVON CARTER:    [signing paper]

SGT. SEAN JONES:  And the last…that's bold.   Let me read that out loud to you.   It says you have been advised of your rights and you understand them.   So you get these [points at paper], right?

DAVON CARTER:    [nodding head]

SGT. SEAN JONES:  You freely and voluntarily waive your rights and agree to talk with the police without an attorney present and what that means is nobody beat you, kicked you…you're in good shape right now. Did I beat you up today?

DAVON CARTER:    [inaudible. Looks at DET. SANDRA FORSYTHE]

SGT. SEAN JONES:  Alright, good.

DET. SANDRA FORSYTHE:        Did I beat you up, Davon?

DAVON CARTER:    No. [laughing]

DET. SANDRA FORSYTHE: [laughing]. I, I, I kept up to my promise, didn't I?

DAVON CARTER:    Right

DET. SANDRA FORSYTHE: You got to see your girl.   You came down here calmly.

SGT. SEAN JONES:  right

DET. SANDRA FORSYTHE: See? I keep my promise. Are you going to talk to us?

DAVON CARTER:    Did she go to the hospital?

SGT. SEAN JONES and DET. SANDRA FORSYTHE:        Yes she did.

SGT. SEAN JONES:  Can you sign that one for me right there? That's your full signature

DAVON CARTER:    [leans forward to sign paper][8]

CARTER BEGINS TO ANSWER QUESTIONS.

Section 3501(b) of Title 18 instructs the trial judge to consider all the circumstances surrounding the giving of a statement when assessing voluntariness, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such

---

[8] The Miranda waiver form is attached as Exhibit B.

defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.   18 U.S.C. § 3501(b).   The law further provides that the "the presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession."

In this case, Carter, who is no stranger to the criminal justice system, was advised of the nature of the interrogation and of the rights contained in subparagraphs (3) and (4) as quoted above. Although approximately six hours appear to have elapsed between the initiation of the traffic stop and the beginning of his interview, Carter was told he was not under arrest and did not have to answer the detective's questions.   Moreover, he was detained in Baltimore County but the interview took place in Baltimore City (where the homicide occurred) and hence there was some delay occasioned by the transport.   Additional time elapsed because Carter wanted to ensure his girlfriend was cared for before the questioning began – an accommodation the detectives agreed to.

The videotape will be available for the Court's review at the time of the hearing in this case and to the above points, the tape will easily establish compliance with *Miranda* and that the statement was voluntary.

## CONCLUSION

Defendant's motions should be denied in all respects.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:  _____

Sandra Wilkinson
Judson T. Mihok
Assistant United States Attorneys

24